IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MAURICE LEVIE, individually and on behalf of )
all other similarly situated, )
)
           Plaintiffs, )
) No. 04 C 7643
    v. )
) Judge Robert W. Gettleman
SEARS ROEBUCK & CO., ALAN J. LACY, ESL )
PARTNERS, L.P. and EDWARD S. LAMPERT, )
)
           Defendants )

**MEMORANDUM OPINION AND ORDER**

Co-lead plaintiffs Maurice Levie and H. Robert Monsky, individually and on behalf of all others similarly situated, brought a three count amended putative class action complaint against defendants Sears Roebuck & Co. and its CEO, President and Chairman of the Board, Alan J. Lacy (the "Sears defendants") and ESL Partners, L.P. and its controlling person Edward S. Lampert (the "ESL defendants") alleging violations of §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78(j)(b) and 78 (t)(a) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 204.10b-5.[1] Plaintiffs have moved for class certification pursuant to Fed. R. Civ. P. 23. For the reasons set forth below plaintiffs' motion is granted in part.

**DISCUSSION**

Fed. R. Civ. P. 23, which governs class actions, requires a two-step analysis to determine if class certification is appropriate. First, plaintiffs must satisfy all four requirement of Rule 23(a): (1) numerosity, (2) commonality; (3) typicality; and (4) adequacy of representation.

---

[1] A full description of plaintiffs' claims can be found in the court's decision denying defendants' motion to dismiss, Levie v. Sears Roebuck & Co., 2006 WL 756063 (N.D. Ill. 2006). Familiarity with that decision is presumed.

These elements are prerequisites for certification, and failure to meet any one of them precludes certification of a class. Second, the action must also satisfy one of the conditions of Rule 23(b). Joncek v. Local 14 Int. Teamsters Health and Welfare Fund, 1999 WL 755051 at *2 (N.D. Ill. 1999) (and cases cited therein). In the instant case, plaintiffs seek certification under Rule 23(b)(3), which requires that questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and effective adjudication of the controversy.

Defendants do not really contest the propriety of proceeding as a class action. Instead, defendants focus their attack on plaintiffs' proposed class definition and the lead plaintiffs' ability to adequately represent any class certified. Plaintiffs propose a class defined as:

> All persons and entities who: (1) sold Sears common stock; (2) sold call options on Sears common stock and/or (3) bought put options on Sears common stock during the period from September 9, 2004 through the close of trading on November 16, 2004.

Defendants first attack the proposed class period, September 9, 2004, through November 16, 2004, arguing that plaintiffs have presented no evidence to support the contention that Sears and Lampert were in merger negotiations by September 9. Essentially, defendants argue that Szabo v. Bridgeport Machines, Inc., 249 F.3d 672 (7th Cir. 2001), requires the court to make a preliminary determination of when the merger negotiations became material and thus were required to be disclosed.

This court does not read Szabo so broadly as to require the court to reach the ultimate issue in the case on a Rule 23 motion. This court has already held that if and when the merger negotiations became material is a question of fact to be determined by the jury. Levie, 2006 WL 756063 at *5. Szabo requires only that the court make factual inquiries to determine if the

2

requirements of Rule 23 are met. In interpreting the Supreme Court's opinion in Eisen v. Carlisle and Jacquelin, 417 U.S. 156, 177-78 (1974), the Seventh Circuit stated that it did not "foreclose inquiry into whether plaintiff is asserting a claim that, assuming its merit, will satisfy the requirements of Rule 23 as distinguished from an inquiry into the merits of plaintiff's particular individual claim." Szabo, 249 F.3d at 677 (emphasis added). Thus, the inquiry for the court is not whether plaintiffs can prove that the merger negotiations became material on September 9 but whether, if they can, class certification would then be appropriate under Rule 23.[2] When the merger negotiations became material affects the class period, which in turn could effect numerosity. Under Rule 23(a)(1), numerosity is met if joinder of all members is impracticable. Even if defendants are correct that the negotiations could not have become material until November 5, 2004, there can be no question that numerosity would nonetheless be met. Thus, there is no need for the court to reach the issue of when the negotiations became material. Assuming the merits of plaintiffs' claims, as required by Szabo (id.), there is simply no question that the class is so numerous that joinder of all members would be impractical. Parker v. Risk Management Alternatives Inc., 206 F.R.D. 211, 212 (N.D. Ill. 2002).

Defendants next attack the definition of the class, arguing that "in-and-outs"[3] cannot be members of the class because they cannot prove loss causation. See Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336 (2005). In Dura, the Supreme Court overturned the Ninth Circuit's

---

[2]The court is not unmindful of the evidence submitted by defendants in support of their argument that the negotiations did not become material and were not required to be disclosed prior to November 5, 2004, at the earliest. That evidence attacks the merits of plaintiffs' claims, however, not the propriety of proceeding as a class.

[3]"Ins-and-outs" are investors who both bought and sold during the class period.

inflated share approach, finding that merely purchasing at an inflated share price does not necessarily mean that there was any resultant economic loss. The court noted, 544 U.S. at 342-43:

> [A]s a matter of pure logic, at the moment the transaction takes place, the plaintiff has suffered no loss; the inflated purchase payment is offset by ownership of a share that <u>at</u> <u>that</u> <u>instant</u> posses equivalent value. . . . If . . . purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss. If the purchaser sells later after the truth makes it way into the market place, an initially inflated purchase price <u>might</u> mean a later loss. But that is far from inevitably so. (Emphasis in original.)

Plaintiffs distinguish <u>Dura</u>, arguing that it involved a "purchaser" class (investors who were induced to buy and sell at an artificially high price), rather than a "seller" class (investors who were allegedly defrauded into selling at an artificially low price), and that the rationale for excluding in-and-out traders in a purchaser class does not apply to a seller class action. According to plaintiffs, in a purchaser class action "where an investor who purchases during the class period sells before the fraud is revealed, that investor is presumed to recover the artificial inflation paid on the purchase at the time of the intra-class period sale, and any decline in value is assumed to be attributable to market price movements unrelated to the alleged fraud." Therefore, that investor does not suffer a loss caused by the alleged misrepresentation or omission. No such rationale applies to a seller class, argue plaintiffs, because any investor who sold during the class period before the revelation of the merger sold at an artificially low price.

The court agrees with plaintiffs that the rationale behind excluding "in-and-out" traders from a traditional purchaser class, where revelation of the truth results in a decrease in stock price, is not applicable to the instant seller class. In the traditional purchaser class, any investor who bought and then sold before the revelation lowered the price incurred no injury as a result of

4

the fraud because the stock was artificially high at the time of the sale, as it was at the time of the purchase. In contrast, in the instant case, any investor who sold (during the class period) before the fraud was revealed incurred injuries because that investor sold at a price that was artificially lower than the investor should have received. Regardless of the price such an investor paid for the stock, the price would have been higher[4] at any point after the (secret) merger negotiations became material and before the merger plans were disclosed. Consequently, that investor would have profited from the disclosure by the difference between the share price actually realized and the higher price that would have been driven by the disclosure. Accordingly, the court rejects defendants' argument that all in-and-out traders should be excluded from the class.

The same is not true, however, for short sellers who sell first and then hope to cover when the price falls. Anyone who sold short during the class period and then covered that sale by purchasing at a lower price before the fraud was revealed was not injured, but actually benefitted from the alleged omission. Short sellers are speculating that the price of a stock will fall before they have to close on the sale. If they guess wrong and the stock rises, they suffer a loss. Thus, anyone who sold short and then covered before the revelation of the merger increased the stock price, benefitted from the artificially low price at the time of the covering purchase. In this respect, short sellers who covered during the class period are comparable to the in-and-out purchasers in the traditional purchaser class. They suffered no injury.

This logic does not apply, of course, to sellers who were still in a short position when the merger was ultimately revealed. The jump in price that allegedly resulted from the revelation of

---

[4] Plaintiffs allege that, upon disclosure of the plans to merge Kmart and Sears on November 16, 2004, the stock jumped 17%.

the merger would cause injury to those traders who had sold short but not yet covered. Therefore, only those short sellers who remained in a short position when the alleged fraud was revealed are included in the class.

Defendants also argue that short sellers, day traders and other option traders are not entitled to rely on the "fraud on the market" theory of reliance because such traders believe that the market price does not accurately reflect all publically available information. As Judge Aspen noted in In re Bally Manufacturing Securities Corp. Litigation, 141 F.R.D. 262, 269 n.6 (N.D. Ill. 1992) (quoting Moskowitz v. Lopp, 128 F.R.D. 624, 631 (E.D. Pa. 1989)):

> Basic's fraud on the market theory was not intended to severely limit the possibility of securities fraud class actions. Indeed, '[t]he fraud-on-the-market presumption is implied to establish reliance not in-face-to-face transactions involving closely-held corporations, but in the impersonal securities exchanges where proof of direct reliance is virtually impossible. It can be stated without fear of gainsay that the roster of shareholders of every large, publically traded corporation includes institutional investors, short-sellers, arbitragers, etc. The fact that these traders have divergent motivations in purchasing shares should not defeat the fraud-on-the-market presumption absent convincing proof that price paid no part whatsoever in their decision making. (Emphasis in original.)

Moreover, traders in put and call options rely on the integrity of information disseminated in the market just as do purchasers and sellers of the underlying security. Tolen v. Computervision Corp., 696 F. Supp. 771, 779 (D. Mass. 1988). The fact that short sellers and put and call option traders may believe that there will be fluctuation in the price of a stock does not mean that they do not rely on the integrity of the information disseminated. "[T]here is a fundamental difference between an investor's presumption that the market price will move and the fact that the price was tainted by fraud." Moskowitz, 128 F.R.D. at 631. Thus, the court disagrees with defendants' position that short sellers, day traders and option traders must be excluded from the class because they can not rely on the fraud-on-the-market theory. As noted

above, any such trader who can establish injury as a result of the alleged fraud is properly included in the class definition.

Defendants' remaining arguments against certification require little discussion. First, defendants argue that option traders cannot be included in the class because neither lead plaintiff had option trading loses. Whether the lead plaintiffs incurred losses through stock purchases or through option trades or otherwise is largely irrelevant. The predominate claim is that defendants failed to disclose the merger negotiations when they had a duty to do so. Each of the lead plaintiffs has standing to pursue this claim on behalf of anyone who was injured as a result of the alleged fraud. Regardless of how each class member purchased or sold the stock or incurred injury, the alleged injury arises from the same event or conduct of the defendants and is based on the same legal theories. Plaintiffs can, therefore, adequately represent the interests of all class members.

Finally, defendants challenge the lead plaintiffs as atypical and inadequate representatives. With respect to plaintiff Monsky, defendants first argue that he is atypical because he is a short-selling day trader. Essentially, defendants argue that he is too sophisticated an investor to represent the putative class and that as a short seller he cannot rely on the fraud-on-the-market presumption of reliance. The court has already rejected the latter argument, and Monsky's sophistication in no way renders him inadequate to represent a class. The fact that Monsky may have devised a different investment strategy as a consequence of his reliance on the market is irrelevant. If he relied on the price of Sears stock to reflect accurately information disseminated in the market, he was injured if defendants made fraudulent misrepresentations and omissions of material fact. See Tolen, 696 F. Supp. at 780.

Defendants also argue that Monsky is an inadequate class representative because he has been sanctioned by the National Association of Securities Dealers ("NASD") for engaging is deceptive stock transactions, and failed to disclose this fact in discovery. Neither of these facts render Monsky inadequate to represent a class. To satisfy the adequacy of representation prong of Rule 23(a)(4), the interests of the class representative must coincide with those of the rest of the class, and the class representative's attorney must be prepared to prosecute the action vigorously, tenaciously and with adequate financial commitment. Gilbert v. First Alert, Inc., 904 F. Supp. 714, 719 (N.D. Ill. 1995). Whether Monsky was in fact sanctioned by the NASD and whether he properly revealed this fact to defendants in discovery bears upon his credibility only, but not on his qualifications to represent the class. Credibility is not a requirement of a class representative, and whether or not a plaintiff is credible is irrelevant to that person's ability to be a class representative. Miller v. Material Sciences Corp., 1999 WL 495490 at *5 (N.D. Ill 1999). Nothing about Monsky's NASD sanction indicates that he would have an antagonistic or conflicting claim, or that he would not have sufficient interest in the outcome to ensure vigorous advocacy. In short, nothing presented by defendants would indicate that Monsky could not fairly and adequately protect the interests of the class. Id.

With respect to plaintiff Levie, defendants argue that he is a "serial class action plaintiff" always using the same counsel. First, there is nothing inherently wrong with a "professional" plaintiff. See Murray v. GMAC Mtg. Corp., 434 F.3d 948, 954 (7th Cir. 2006). Under the Private Securities Litigation Reform Act ('PSLRA"), a person may be a lead plaintiff in no more than five securities class actions bought as plaintiff class actions during any three year period. 15 U.S.C. § 78u-4(a)(3)(B)(vi). Despite having been involved in a number of securities class

8

actions, Mr. Levie has not sought appointment to serve nor has served as lead plaintiff or class representative in any securities class action since 1997. The fact that Mr. Levie has been involved in a number of class actions, and has used the same counsel in each, in no way suggests that he has an antagonistic or conflicting claim or that he does not have sufficient interest in the outcome to ensure vigorous advocacy. Indeed, such facts likely demonstrate that he has the ability to fairly and adequately protect the interest of the class. Thus, the court rejects defendants' challenges to Mr. Levie as a class representative.

## CONCLUSION

For the reasons set forth above, plaintiffs' motion for class certification is granted in part. The class includes investors who sold during the class period (from September 9, 2004, through the close of trading on November 16, 2004) and the "in-and-out" investors, but excludes short sellers except those who were in a short position at the close of trading on November 16, 2004. Because the parties have not sufficiently explained the propriety of including option traders and holders of puts and calls, the parties are directed to file position papers on the proper class definition on or before July 30, 2007, and appear at a status hearing August 16, 2007 at 1:30 p.m.

**ENTER:    July 17, 2007**

_____
**Robert W. Gettleman**
**United States District Judge**