IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MAURICE LEVIE, individually and on behalf of all others similarly situated, ) ) ) Plaintiffs, ) ) v. ) ) SEARS ROEBUCK & CO., ALAN J. LACY, ESL ) PARTNERS, L.P. and EDWARD S. LAMPERT, ) ) Defendants ) | No. 04 C 7643 Judge Robert W. Gettleman |

**MEMORANDUM OPINION AND ORDER**

Co-lead plaintiffs Maurice Levie and H. Robert Monsky, "individually and on behalf of all others similarly situated," have brought a three count amended class action complaint against defendants Sears Roebuck & Co and its Chief Executive Officer, President and Chairman of the Board Alan J. Lacy (together, the "Sears defendants"), and ESL Partners, L.P. and its controlling person Edward S. Lampert (the "ESL defendants") alleging violations of §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a) and Rule 10b-5 promulgated thereunder by the Securities Exchange Commission ("SEC"), 17 C.F.R. § 240.10b-5. After denying defendants' motion to dismiss, Levie v. Sears Roebuck & Co., 2006 WL 756063 (N.D. Ill. 2006), the court certified a class consisting of: (1) investors who sold Sears stock during the class period (September 9, 2004 through the close of trading on November 16, 2004) and the "in-and-out" investors, but excluding short sellers except those who were in a short position at the close of trading on November 16, 2004; (2) sellers of Sears' call options during the class period whose call option positions remained open (were not re-purchased) after the close of trading on November 16, 2004; (3) buyers of Sears' put options who purchased their put options during the

class period, and whose put options position remained open as of the close of trading on November 16, 2004; (4) buyers of Sears' call options during the class period whose call options expired worthless before the last day of the class period; and (5) sellers of Sears' put options during the class period who covered (re-purchased) those put options during the class period. Levie v. Sears, 496 F. Supp.2d 944 (N.D. Ill. 2007); Levie v. Sears Order dated August 28, 2007 (Docket No. 145).

After extensive discovery, each set of defendants has filed a separate motion for summary judgment. In addition, defendants have filed joint motions to strike plaintiffs' L.R. 56.1 Statements and to decertify the class. For the reasons explained below, defendants' motion to strike is granted, and both motions for summary judgment are granted. The motion to decertify the class is denied as moot.

Summary Judgment Standards

A movant is entitled to summary judgment under Fed. R. Civ. P. 56 when the moving papers and affidavits show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(b); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Once a moving party has meet its burden, the nonmoving party must go beyond the pleadings and set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); Becker v. Tenenbaum-Hill Associates, Inc., 914 F.2d 107, 110 (7th Cir. 1990). The court considers the record as a whole and draws all reasonable inferences in the light most favorable to the party opposing summary judgment. Fisher v. Transco Services-Milwaukee, Inc., 979 F.2d 1239, 1242 (7th Cir. 1992).

A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The non-moving party, however "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Electric Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." Anderson, 477 U.S. at 252.

To help ease the court's task in cases such this, with extensive factual records, the Northern District of Illinois has adopted Local Rule ("L.R.") 56.1, which requires certain filings in support of and in opposition to motions for summary judgment. L.R. 56.1(a)(3) requires the movant to provide a statement of material facts as to which it contends there is no genuine issue. The statement must be in the form of numbered paragraphs with specific references to the parts of the record or other supporting materials relied upon. The non-movant must reply to each paragraph, either admitting that the statement is uncontested or stating that it disagrees, specifically citing to supporting materials showing that there is a genuine factual dispute. L.R. 56.1(b)(3)(A), (B). The non-movant may also supply a statement of additional facts, if any, that would defeat summary judgment, again in the form of numbered paragraphs with supporting citations to the record. L.R. 56.1(b)(3)(C). The moving party must then reply to the statement of additional facts, paragraph by paragraph, admitting the statement or contesting it with specific citations to supporting materials.

What would appear to be a simple enough procedure for the orderly presentation of a summary judgment motion has proven to be anything but. All too often compliance with the

Local Rule has led to extensive, expensive, and unnecessary satellite litigation that does nothing to advance the case or aid the court. See Thompson v. Waukesha State Bank, 510 F. Supp.2d 453, 455-56 (N.D. Ill. 2007).

In the instant case, both the Sears and ESL defendants filed proper L.R. 56.1 statements in support of their motions for summary judgment. As defendants point out in their joint motion to strike, however, plaintiffs' responses to those statements are completely noncompliant. Rather than simply admit that a particular numbered statement is uncontested or deny that it is uncontested with a supporting citation to the record, plaintiffs' statements are lengthy and argumentative, essentially presenting their version of the "facts." The citations provided to support that "version" fail to do so in any meaningful way, at least without the convoluted and improper argument added to each response. An L.R. 56.1(b) response is not a platform, however, to present a party's argument. Portis v. City of Chicago, 510 F. Supp.2d 461, 463 (N.D. Ill. 2007). This failure to comply with the Local Rule justifies granting the joint motion to strike, and would also justify deeming each of defendants' statements of fact to be uncontested. Thompson, 510 F. Supp.2d at 456; Bordelon v. Chicago School Reform Board of Trustees, 233 F.3d 524, 528 (7th Cir. 2000). "[D]istrict courts are not obliged in our adversary system to scour the record looking for factual disputes." Greer v. Board of Education, 267 F.3d 723, 727 (7th Cir. 2001).

Nonetheless, rather than decide the case on the failings of lawyers, the court has endeavored to examine plaintiffs' citations in support of their denial of the facts presented by defendants. Having immersed itself in the rather extensive record, the court concludes that the following facts are uncontested:

(1) In February 2004, Lacy (of Sears) began to explore a potential transaction between Sears and Kmart. He was considering potentially acquiring Kmart by buying Kmart shares. He reached out to Lampert, who was Chairman of Kmart's Board of Directors. Both Lacy and Lampert agreed that Lampert explicitly stated that he was acting solely on behalf of Kmart and not on behalf of ESL Partners, which at that time owned greater than 5% of Sears.

(2) On March 10, 2004, Lacy told the Sears' Board of Directors that he had had very preliminary discussions with Kmart about a Sears' acquisition.

(3) On March 16, 2004, Sears and Kmart executed a one way "Confidentiality Agreement" by which Kmart would disclose certain confidential information to Sears to allow Sears to evaluate Kmart. At this time there had been no discussion of Kmart acquiring Sears.

(4) By late April 2004 both sides agreed that there would be no broad transaction of Sears acquiring Kmart in its entirety. Instead, the parties began discussion of an "alternative transaction" with Sears purchasing specific Kmart (stand alone) stores. The Sears' Board of Directors described this alternative plan ("Plan B") as just a smaller test of the original "Plan A," in which Sears would acquire all of Kmart.

(5) On April 28, 2004, Kmart requested that Sears return or destroy the confidential information given to it pursuant to the March 16, 2004, agreement because the Sears acquisition of Kmart was no longer on the table.

(6) The following day, April 29, 2004, Lacy reported to the Sears' Board of Directors on the status of what had been termed "Project Bay" (the potential acquisition of Kmart).

"Bay" was the code name for Kmart and "Harbor" was the code name for Sears. Lacy reviewed the original intent of Project Bay as a retail merger with "opportunity for a significant number of conversions into the Harbor (Sears) format." He commented on valuation estimates and expectations and governance issues, the result of which was that the "management team has reached the conclusion that a merger ("Plan A") would not be an appropriate transaction at this point in time." Lacy then described "Plan B" and the opportunity for a Sears off-mall expansion, and a report was presented regarding the purchase of Kmart stores. Sears started with 329 stores, Kmart countered with 200 stores. After modification there was a discussion in the Sears' Board of Directors of Sears' purchase of approximately 93 stores. Lacy asked for and was given permission to talk to Kmart about the 93 stores in the price range of $800 million to $1.2 billion.

(7) Sears and Kmart then entered into fairly lengthy discussions about which stores would be involved in any potential deal with the result ultimately funneling down to which stores Kmart wanted to sell and those that Sears wanted to buy.

(8) On May 19, 2004, Sears sent a letter to Kmart certifying that Sears had destroyed all confidential material given to it under the March 16, 2004, agreement except for certain information relevant to the more limited ongoing transaction.

(9) On June 30, 2004, the parties announced to the market that Sears would purchase 54 Kmart stores for $621 million.

(10) On August 30, 2004, Sears certified to Kmart that it had destroyed all remaining confidential information in its possession except for Board materials and materials related to the specific 54 stores to be sold. There were no longer any discussions at this

point of a merger or combination of any form, and certainly there had never been any discussion of a Kmart acquisition of Sears.

(11)     For the period September 1, 2004, through October 31, 2004, there were no discussions between Sears and Kmart, Lacy or Lampert, regarding a Sears acquisition of Kmart, a Kmart acquisition of Sears, or any other form of merger or combination.

(12)     On October 15, 2004, there were emails between Lacy's staff and Lampert's staff regarding an attempt to schedule a meeting for November 1, 2004. Lacy said he was preparing for talks of some sort of deal but nothing specific.

(13)     On October 21, 2004, Sears announced its third quarter financial results. Lampert and Lacy spoke on the phone and set up an October 31, 2004, meeting.

(14)     Also on October 21, 2004, Vernado Realty Trust told Lampert of its acquisition of a large ownership position in Sears. Lampert told Lacy of the acquisition without revealing Vernado's name. The possibility of cooperation between Sears and Kmart was identified as a topic for the October 31, 2004, meeting.

(15)     On October 31, 2004, Lacy and Lampert met at Lampert's house. Lampert broached the subject of a business combination in which Kmart would acquire Sears. Sears common stock would be exchanged for Kmart common stock. This is undeniably the first time that the subject of a Kmart acquisition of Sears had come up. There was certainly no agreement at this point in time. And again, Lampert made clear that he was acting solely in his capacity as Chairman of the Board of Kmart.

(16)     On November 1, 2004, Lacy reported to the Sears' Board of Directors on his conversation with Lampert. Both sides raised the subject with outside advisors.

7

(17)     Between November 1 and November 5, 2004, Sears and Kmart senior management had internal discussions regarding strategic combinations and retained financial and legal advisors.  Also on November 5, 2004, Vernado announced its acquisition of 4.3% of Sears.  Sears stock jumped from $37.18 per share to $45.88 per share.  Lampert viewed the announcement as a potential accelerant for something and also as potentially diminishing the chances that something would happen.

(18)     On November 8 and 9, 2004, Lacy and Lampert briefed their respective board of directors on the progress of the discussions.  The minutes of these meetings indicate a shared interest in accelerating talks because of the volatility of Sears shares in light of the Vernado announcement.  By this time Kmart had expressed its desire to acquire Sears.  The parties had talked about price and the form of consideration.  There was a "general agreement" that any transaction would be a combination of stock and cash, but no ratios had been finalized and there was much work to be done.  No due diligence had been done at this time.

(19)     On November 10, 2004, Sears and Kmart executed a new confidentiality agreement that allowed Kmart to examine Sears' confidential materials.  This was the first time that Kmart had seen Sears' information.

(20)     Two days later, on Friday, November 12, 2004, Kmart's counsel sent Sears' counsel an initial draft.  That weekend, November 13 and 14, 2004, Kmart and its financial advisor Lehman Brothers, and Sears and its advisor Morgan Stanley performed due diligence in New York.  A draft contract was reviewed and revised by both sides.

(21) On November 13, 2004, a new draft was re-circulated that contained the first reference to a support agreement by ESL to a change in the ownership of Sears.

(22) In an email two days later on November 15, 2004, Sears' financial advisor estimated a 50-50 chance for an announcement on Wednesday and a 50-50 chance for a deal. At that point, at 8:32 a.m. on November 15, 2004, it is clear that the parties had not yet reached an agreement. Two and a half hours later, however, Lampert and Lacy reached a handshake deal to present to their respective boards.

(23) The following day on November 16, 2004, both boards approved a deal, with final approval coming from Sears' board at approximately 4:00 p.m.

(24) On November 17, 2004, before the exchanges opened the transaction was publically announced.

## DISCUSSION

The Sears Defendants

In Count II, plaintiffs allege that the Sears defendants violated § 10(b) and Rule 10b-5 by failing to disclose the merger negotiations during the class period. Section 10(b) and Rule 10b-5 make it unlawful for any person "to make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in connection with the purchase or sale of any security." 17 C.F.R. § 24.10b-5(b). In their motion to dismiss the Sears defendants argued that they were under no duty to disclose any discussions, relying on the general proposition that silence, absent a duty to disclose, is not misleading under Rule 106-5. Basic Inc v. Levinson, 485 U.S. 224, 239 n.17 (1988). They then argued that because under Seventh Circuit precedent

9

merger negotiations do not become "material" until the price and structure of the deal have become agreed upon, which did not happen until immediately before the merger announcement, any announcement made by Sears during the class period could not create a duty to disclose the merger negotiations because those negotiations had not yet become material.

The court rejected this argument because under Basic, the materiality of merger negotiations "depends upon the probability that the transaction will be consummated and its significance to the issuer of the securities. This determination is fact-specific and must be made on a case by case basis" and cannot be decided on a motion to dismiss. Because Rule 10b-5 makes it unlawful for any person to omit a material fact necessary to make a statement made in light of the circumstances under which it was made not misleading, this court concluded (Levie v. Sears Roebuck & Co., 2006 WL 756063 at * 5):

> If the merger negotiations became material at a point in time when the Sears defendants were making announcements about the purchase of Kmart stores, a jury could find that the existence of the merger negotiations was a material fact necessary to make the store purchase statements not misleading.

The Sears defendants' current motion for summary judgment, now buttressed by the undisputed facts set out above, argues that they were correct all along. First, the facts demonstrate that the merger negotiations began on October 31, 2004, not prior to the start of the class period as alleged in the complaint. Second, the Sears defendants argue that the facts show that they were never under a duty to disclose the negotiations, even after they became material.

Because there is no general duty to disclose merger negotiations even when material, Basic, 45 U.S. at 239 n.17, plaintiffs' case is premised entirely on the omission to disclose the merger negotiations in order to make the statements made during the class period non-misleading. The complaint identifies and plaintiffs rely on five class period statements made by

10

Sears to create the duty to disclose. To determine whether plaintiffs' case can survive summary judgment, the court must analyze those statements, including when they were made, and then compare them to the state of the discussions between Sears and Kmart, to determine if the statements made were misleading in light of those discussions.

Three of the statements on which plaintiffs rely, a presentation by Sears' CFO Glenn Richter at a September 9, 2004, conference setting out Sears' strategic objectives, a September 29, 2004, press release announcing the completion of the acquisition of the 50 Kmart stores, and the October 21, 2004, press release announcing Sears' third quarter earnings, predate the start of the merger negotiations on October 31, 2004. Obviously, these statements could not create a duty to disclose something that had yet to occur. Stransky v. Cummins Engine Co., Inc., 51 F.3d 1329, 1332 (7th Cir. 1995) (Rule 10b-5 "implicitly precludes basing liability on circumstances that arise after the speaker makes the statement.").[1]

The next statement upon which plaintiffs rely to create a duty to disclose the merger negotiations is Sears' November 5, 2004, response to Vernado's announcement that it had acquired a 4.3% interest in Sears' equity. In response to Vernado's announcement, Sears released a statement to certain members of the press:

> We are pleased that Vernado sees value in our stock. We are taking strong, concerted actions to improve our full-line store performance, continuing to expand our direct-to-customer channels and building our home services business, while simultaneously pursuing an aggressive off-mall growth strategy.

---

[1] This same reasoning applies to plaintiffs' claim that Sears violated Rule 10b-5 by engaging in a repurchase plan without disclosing the potential merger. It is undisputed that Sears had ceased repurchasing its stock prior to October 31, 2004.

For this statement to be actionable, plaintiffs must show that it was misleading in light of the circumstances under which it was made, which would then require Sears to provide material facts it had omitted, in order to make this statement non-misleading. In other words, the statement must have been misleading in light of the merger negotiations that had, at that point in time, already become material under Basic. Plaintiffs cannot prevail on either prong.

First, there is nothing inaccurate or misleading in the statement with or without disclosure of the merger discussions. To support the claim, the alleged material omission (the merger discussions) should relate directly to or be sufficiently linked to the express statements made so as to render them inaccurate or misleading. Kaufman v. Motorola, 1999 WL 688780 at *8 (N.D. Ill. 1999); Kas v. Caterpillar, Inc., 815 F. Supp. 1158, 1172-73 (C.D. Ill. 1992). Obviously, nothing in the Vernado response refers to the merger negotiations or in any way implies that Sears was not engaged in such negotiations. Plaintiffs have not identified anything in this statement that is in direct conflict with the merger negotiations, see Caremark, Inc. v. Coram Healthcare, Corp., 113 F.3d 645, 650 n.7 (7th Cir. 1997), and nothing Sears said about its off-mall strategy is in conflict with the notion of a potential merger. Nor is there any evidence that Sears intended to or did abandon that strategy after the merger.

Additionally, the undisputed evidence demonstrates that on November 5, 2004, the negotiations had not yet become material. At the time of the statement, none of the factual or legal predicates for a merger were in place. There were no board resolutions, no actual negotiations and no instructions to investment bankers to facilitate or explore a merger. See Basic, 485 U.S. at 239. It is true that each company had raised the subject with outside advisors, and senior management of the two companies held discussions about strategic combinations, but

12

it was not until November 9 that there was even a "general agreement" that any transaction would involve a combination of stock and cash. Even at that time no structure had been reached and the parties had not begun due diligence. In fact, Kmart did not acquire the confidential information it needed to assess the prospect of a merger until after November 10, when the companies executed the Confidentiality Agreement.

In short, the status of the merger negotiations on November 5, 2004, were preliminary in nature. Indeed, the chances of a deal were assessed at only 50-50 on the morning of the day the agreement was actually reached, ten days after the Vernado response. The materiality of information concerning a proposed merger is directly related to the likelihood that the merger would be accomplished. "The more [t]entative the discussions the less useful such information will be to a reasonable investor in reaching a decision. Information of speculative and tentative discussions is of dubious and marginal significance to that decision. To hold otherwise would result in endless and bewildering guesses as to the need for disclosure, operate as a deterrent to the legitimate conduct of corporate operations, and threaten to 'bury the shareholders in an avalanche of trivial information;' the very perils that the limit on disclosure imposed by the materiality requirement serves to avoid." Taylor v. First Union Corporation of South Carolina, 857 F.2d 240, 244-45 (4th Cir. 1988) (quoting TSE Industries Inc. v. Northway Inc., 426 U.S. 438, 448-49 (1976)).

Finally, the last statement on which plaintiffs rely to create a duty to disclose the merger negotiations is Sears' Third Quarter 10-Q filed on November 9, 2004. The 10-Q contained an MD&A section (Management, Discussion and Analysis of Financial Condition) as required by 17 C.F.R. § 229.303. According to plaintiffs, the 10-Q falsely stated that the "company's

13

primary need for liquidity will be to fund the seasonal working capital requirements of its retail businesses and capital expenditures," when in fact Sears was seeking to conserve and acquire additional capital to fund the planned merger.  This argument makes little sense given that it was Kmart than needed capital to purchase Sears.  As Sears points out, it is also irreconcilable with the explicit mandate of the SEC that when disclosure of merger negotiations "is not otherwise required, and has not otherwise been made, the MD&A need not contain a discussion of the impact of such negotiations where, in the registrant's view, inclusion of such information would jeopardize completion of the transaction."  SEC Rel. No. 33-6835, 1989 WL 270492 at *22436 (May 24, 1989).  Accordingly, plaintiffs cannot base their 10b-5 claim on a failure to disclose merger negotiations in a Form 10-Q.

For the reasons explained above, the Sears defendants' motion for summary judgment is granted.

ELS Defendants

Section 13(d) of the Exchange Act requires anyone who acquires more than a 5% interest in the beneficial ownership of a security to file a Schedule 13D.  If, however, the person had not acquired the securities with any purpose, or with the effect, of changing or influencing the control of the issuer, or in connection with or as a participant in any transaction having that purpose or effect, the person may file a short-form statement on Schedule 13G in lieu of the Schedule 13D.  17 C.F.R. § 240.13d-1(c).  If at any time a change occurs and that person that has reported ownership on a Schedule 13G holds the securities with a purpose or effect of changing or influencing control of the issuer or in connection with or as a participant in any transaction

14

having that purpose or effect, the person must file a statement on Schedule 13D so indicating within 10 days.

On July 1, 2004, ESL filed a Schedule 13G with the SEC in which it certified that it had not acquired and was not holding its Sears stock for the purpose of or with the effect of changing or influencing control of Sears. Plaintiffs claim that the ESL defendants violated § 10(b) and Rule 10b-5 by failing to file a Schedule 13D once ESL Partners had formulated an intent to effect a change in control of Sears.

The parties have spent a great deal of effort debating the disclosure requirements of § 13(d). Relying on <u>Newell Co. v. Vermont American Corp.</u>, 725 F. Supp. 351, 381 (N.D. Ill. 1989), plaintiffs argue that a Schedule 13D must be filed promptly if any material change occurs in the facts, and that information considered material includes a plan that would result in a change in the make-up of the board of directors and any aspirations by the filer to seek a control position, even if the filer does not yet have a finalized plan for exercising control. <u>Id</u> at 382. Defendants counter with the leading case of <u>Azurite Corp. Ltd. v. Amster & Co.</u>, 52 F.3d 15, 18 (2d Cir. 1995), which held that proof of a control purpose must evince "a determination made with an element of resolve" to change control of the issue.

Assuming there is an actual conflict between these two standards, it does not matter which applies because plaintiffs cannot prevail under either. Plaintiffs' claim is that ESL had a duty to file a Schedule 13D <u>prior</u> to the start of the class period on September 16, 2004. There is no evidence to support this claim. Plaintiffs' entire theory of the instant case is that Sears and Kmart were engaged in merger negotiations from February 2004 until the ultimate a merger was announced on November 17, 2004. The undisputed facts simply do not bear this out. As

15

discussed above, there were two separate deals considered and two separate sets of negotiations. The first set of negotiations regarding a proposed deal (Sears' acquisition of Kmart) terminated by late April, and had never really gotten off the ground. The second set of negotiations began on October 31, 2004, one and one-half months after the start of the class period.

Moreover, even if plaintiffs were correct that there was one long ongoing negotiation from February until November, their theory that ESL was required to file a Schedule 13D prior to the class period still fails. The originally discussed deal involved Sears' acquisition of Kmart, which in no way involved the change in control of Sears that would trigger a new filing requirement under § 13(d). Nor is there any evidence that ESL participated in those discussions in any way.

The earliest possible date that ESL could have been required to file a Schedule 13D would be November 10, 2004, ten days after the start of the merger negotiations regarding Kmart's acquisition of Sears. But the evidence demonstrates that Lampert was acting solely in his capacity as Chairman of the Board of Kmart, and not on behalf of ESL. The first evidence of any ESL involvement is the November 13 draft contract which added the ESL support agreement. Evening assuming that ESL had agreed to participate a week earlier (of which there is no evidence) when the talks were still preliminary, ESL filed its Schedule 13D within the required ten days. Because ESL has not violated § 13(d), plaintiffs cannot establish a violation of § 10(b) or Rule 10b-5.

Accordingly, for the reasons set forth above, the ESL defendants' motion for summary judgment is granted.

## **CONCLUSION**

For the reasons set forth above defendants' joint motion to strike is granted, all defendants' motions for summary judgment are granted,[2] and defendants' joint motion to decertify is denied as moot.

**ENTER:      December 18, 2009**

_____
**Robert W. Gettleman
United States District Judge**

---

[2]Count III, which asserts control person claims against Lacy and Lampert under §20 of the Exchange Act fail as a result of the failure of the primary claims. Pugh v. Tribune Co., 521 F.3d 686, 693 (7th Cir. 2008).